CROMPTON (HOWARD v.). See Case No. 6,758.

## Case No. 3,409.

### CROMWELL v. BANK OF PITTSBURG.

[2 Wall. Jr. 569;[1] 1 Pittsb. Leg. J. 17.]

Circuit Court, W. D. Pennsylvania. Nov. Term, 1853.

EQUITY OF REDEMPTION — ESTOPPEL IN PAIS — PENNSYLVANIA RECORDS—ENTRY AND PRESUMPTION OF FORMAL JUDGMENT — CORRECTION OF CLERICAL MISPRISIONS.

1. Even where no judgment of foreclosure has been entered on a mortgage, if the mortgagor allows the mortgagee to hold possession for twenty years without accounting, or without admitting that he possesses the mortgage title only, the mortgagee's title becomes as absolute in equity, as it was previously at law; and this though the land has grown greatly valuable during the term.

2. Even where no judgment of foreclosure has been entered on a mortgage, yet if the mortgagor has admitted in writing the whole mortgage debt to be due; has assisted by his signature and acts to forward and expedite the master or sheriff's sale of the mortgaged premises; waiving matters of form; surrendering possession to the purchaser; and moving away, or standing by and suffering purchasers, for large and valuable consideration, to improve the prop-

·erty.—he is equitably estopped in pais from asserting his ownership for want of a proper authority, at the time, in the master or sheriff to sell.

3. ·The history of records and of the mode of entering judgments in Pennsylvania, is given in this case in detail; and the loose and careless mode of preserving judicial papers, and transacting matters of form, by judges, prothonotaries, attorneys and parties in Pennsylvania, set forth. It is declared that a record is seldom or never, and never need be, made up at the time in form; all that is required being sufficient outline entries upon which, as upon a fabric or frame, a formal record can be afterwards wove or filled in, so as to be certified if wanted.

4. No actual, formal· entry of judgment, on any docket or other paper, need ·be ·made by either court or prothonotary to justify the issue of final process, as on a judgment. If ·the party himself, prior to the precipe for final process, have signed a paper meant to authorize such entry—whether such paper be expressed in the present or in the past tense—it is enough. The clerk may enter judgment on his dockets, or make up a formal record at any time afterwards. e. g. if a party by writing, signed, says, "In my proper person, I this day appeared and confessed judgment to the plaintiff, for, &c., besides costs," &c., on this final process may issue, even though no more formal entry of judgment has been made on the docket, or on the record by the court or prothonotary, or by any body.

5. The original or rough·docket upon which, according to ordinary practice of the· court, judgments were formally entered, having been lost, such formal entry of a judgment, may, at the distance of thirty years, be presumed, from the fact that the defendant in the case had signed a writing, filed among the papers of the case, prior to the alleged date of judgment, saying that he had appeared and confessed judgment; this writing being followed immediately by a precipe for final process, and by final process itself, both of which recite a judgment; by an agreement of the defendant expediting the sale, indorsed on such final process; by an actual sale made with his concurrence, and remaining unquestioned by him during the residue of his life, a term of about thirty years. And this although the final process recite a judgment, as of a date different from the day when judgment was alleged to have been entered; to wit, recite a judgment as entered on the 13th of May, 1820, instead of the 13th of September, 1820; and although no entry of judgment was made upon a larger and cleaner docket, upon which it was as usual to transcribe the entry of judgments from an original or rough docket, as to enter them previously .upon the latter docket itself.

6. If the record shows anything to amend by, the court may amend its own records at the distance of fifteen years, as in this case, or at any distance of time, without any notice to the parties, and without their presence. The action of the court in this respect, cannot be questioned by another court, even upon error.

7. This last point was the only one actually necessary to be decided; but the case having been fully argued on the other points, they were all passed upon by the court.

Thomas Cromwell being seised of a large tract of land near Pittsburg, mortgaged it in fee, in May, 1819, to the Bank of Pittsburg. A scire facias (equivalent to the equity bill of foreclosure,) having issued in August, 1820, upon the mortgage, service was accepted by Cromwell, and the writ regularly returned. By the practice of the court, the entries of all its judgments were first made

[1] [Reported by John William Wallace, Esq.]

in a rough or small docket, and then as regularly copied, with care, from it into a clean and larger one; none being copied into the larger, unless first made in the rough one. The large docket contained no contemporaneous entry of judgment; and the smaller or rough one being now lost, the only direct evidence of a judgment at all, independent of writs and other papers reciting it, was an original paper, without date itself, signed by Cromwell, found in the bundle of papers in the case, among the records of the court, and indorsed at the time by the clerk, with his signature and date of the 13th of September, 1820. The paper was properly entitled, and ran thus: "In my proper person, I this day appeared before the prothonotary, in his office, and confessed judgment to the plaintiff, for $21,740.40, besides costs, with a release of all errors, without stay of execution, and that the plaintiff shall have execution by levari facias to November term, 1820. Thomas Cromwell." On the same day, the 13th of September, 1820, on which this paper was filed, the attorney of the bank directed a precipe in the case, properly entitling it by term and number; and adding "scire facias sur mortgage and judgment. Issue levari," &c. A levari facias, reciting the judgment, accordingly issued; but it recited a judgment as having been entered on the 13th day of May, 1820, and not on the 13th of September; the day when it was entered, if entered at all. There was a stay-law at this time, in Pennsylvania, but by an indorsement on the writ of levari, Cromwell, "the within defendant and mortgagor, acknowledges to have received due and regular notice of the time and place of holding an inquisition and appraisement, and releasing all errors touching the premises." The property was sold in November, 1820, by the sheriff to the mortgagees, the defendants in this case, the Bank of Pittsburg: and a deed regularly acknowledged in open court. The bank, having received from Cromwell, in the spring of 1821, full possession, proceeded to sell it out in parcels, as opportunity offered, and had sold it all out prior to 1830. The property—vacant ground when bought by the bank—had now become the site of a large and incorporated village, and was covered with extensive and permanent improvements.

On the 1st of December, 1835–6, some of the purchasers from the bank discovering the state of the record, that the usual entry of judgment did not appear on the large docket, and that the date of the judgment as recited in the levari, did not conform to the date of the judgment which Cromwell appeared to have confessed, Mr. Charles Bradford, who was their counsel, took a rule in the court in which the case was, to show cause why the record should not be amended by the entry on the docket, as of September 13th, 1820, "of the judgment which appears among the papers of the case;" which rule was, after consideration, made absolute. And on the 19th of March, 1836, took another rule absolute to amend the levari facias, "by inserting the 13th day of September, A. D. 1820, instead of the 13th day of May of the same year, so as to conform to the judgment;" which rule was also made.[2]

Cromwell, the mortgagor, having moved away from Pittsburg soon after the sale, died in 1851; never having raised any objection to the proceedings.

It did not appear that notice had ever been given to him of this application to amend the docket or levari.

Upon these facts this bill was filed by his heirs to have an account of the rents and profits of the mortgaged premises; and if the mortgage debt, interest and costs, had not been fully discharged, then, upon payment of any balance, or, if they had been discharged, then without such payment, to have the mortgage cancelled and delivered up, and satisfaction entered on record.

There were several suits of dower on the law side of the court, dependent upon the same point essentially as one decided as a third point in this case; and by consent the whole matter was made dependent upon the decision of that point here.

For the Complainants. The equity and only equity of this case is, that the mortgagee

[2] The following was the opinion of the court, delivered December 14th, 1835, upon the former of these motions:—

DALLAS, C. J. It is apparent on the face of the record in this case, an exemplification of which has been furnished to the court, that the amendment now desired is rendered necessary, in consequence of the neglect or omission of the prothonotary to enter upon the appearance docket a judgment confessed by the defendant in person, on the 13th September, 1820, which confession was contained in a slip of paper signed by the defendant, and filed with the papers in the case, but never noticed in the docket entries. The doctrine of amendments has, in modern practice in Pennsylvania, been applied on very liberal principles: the exercise of the power now invoked, generally speaking, tends very much to the promotion of justice. To deny the amendment now prayed for, might be productive of consequences alike as unjust as they would be extensively injurious. There is here something to amend by, and the effect of the amendment is to make that appear upon the docket which the prothonotary ought to have made appear, on the day that the confession of judgment by the defendant was filed. The case of Murray v. Cooper, 6 Serg. & R. 126, argues strongly in favour of the present rule. In that case Chief Justice Tilghman, in delivering the opinion of the court, says: "But, independently of the statute (17 Car. II. c. 8), the court has power, in order to do justice, to enter judgment at their discretion, as of a past time, when it ought to have been entered. It was so determined in the case of Griffith v. Ogle, 1 Bin. 172. Perhaps," continues the chief justice, "it was through the fault of the prothonotary that it was not entered." So far as the parties to the record are concerned, it is no more than justice to consider it as entered at the time when they thought it was and intended it should be entered. As to third parties, they are not to be injured. The entry of the judgment, as of a past time, will not be permitted to affect their rights.

shall have his money and interest upon it, and that the mortgagor shall have his land. This equity—the right to redeem—is a peculiar favourite equity. It is so much an equity that it is called the equity of redemption; and it is one which the courts of chancery will go very far to encourage, assist, and uphold. Chancery will consider the debt as subsisting until it is regularly foreclosed, and it will even open a regular decree of foreclosure, years after foreclosure, upon grounds strongly conscientious. It will make all presumptions in favour of the equity, none against it. Least of all will it attempt to support void, erroneous, or even irregular proceedings to destroy it. It looks with suspicion upon even the solemn release by a mortgagor of his equity of redemption; and will not support it unless it were clearly made by one who was quite untrammelled, cognizant of his rights and acts, and who in parting with his equity had received its full equivalent. To imply an abandonment of that equity, and to construe beyond its literal operation, and as having the intention and effect of such abandonment, any act of the mortgagor which naturally does or can operate more restrictedly and without such abandonment, would be abhorrent to every principle of equity. It will take the acts and admissions of the mortgagor for what they do or admit; and will not take them, or suffer a hard creditor to take or claim them, one tittle beyond either their action or their language.

In the case now before us, when the bank issued her sci. fa. she admitted a subsisting right of redemption. She does not claim under a long possession without being called to account. Her suit is quite inconsistent with such claim. The suit never having been withdrawn or dismissed, it is still open unless she has proceeded to judgment. She claims under a sheriff's sale upon a valid judgment, or she has no claim. And she cannot claim validly, unless the judgment was valid.

Now, no judgment was ever entered. What if judgment might, or could, or ought to have been entered on the dateless paper put away among the "papers of the case?" The answer is, that it was not entered. "Judgment is the sentence of the law pronounced by the court upon the matter contained in the record." It is not the act of the defendant at all. He may confess a judgment, but he confesses it to the court, and the court accepts and records his confession in its judgment. It may be in a solemn form, or in a form not solemn, and one form is as good as the other. It may have the "whereupon the matters and record aforesaid having been seen and by the judges here fully understood," &c.; or it may be "judgment," "judg't," or even "J." Language, sign, orthography, is not important. But there must be some language, some sign, some orthography; and being matter of record, it can be proved by inspection of the record only. Suppose an amicable agreement to enter judgment on a fixed day, drawn up and signed by the parties in the most approved form, meant to be entered on the record, would it be "a judgment," until the court had exercised its action upon it? Would it be, even if the defendant said in express terms, "I hereby do confess judgment, and judgment is hereby entered?" Would this be a lien? Would any prothonotary certify to it as a judgment, till it was entered by the court or by some officer of the court, on some roll, or docket, or index, or paper? In this case the dateless paper is in the past tense; it refers to something previously done of record, which the record shows was not done, or does not show was done. It does nothing. It is no present judgment. It can be no past, nor any future one. It claims that the admission of a prior confession of a judgment by a party, is an entry of judgment by the court. The docket being shown to be lost, but it not being shown at all what that docket contained, the paper amounts at very best to but parol proof, without grounds laid for parol proof, that a judgment was confessed. This is a matter not to be proved by parol at all, unless there be ground laid in prior proof that a record of judgment once existed, and has now been lost. Suppose any person, after this paper had been signed and filed, had, bonâ fide and for value, and after an inspection of the dockets, rolls, and minutes, and search there for entry of judgments, without finding any, bought this land as free from the lien of any judgment, would such purchaser be affected? Certainly not. The bank might have its action against the prothonotary on his official bond for his not having done his duty, but the land would be free of everything but the mortgage itself. None of Cromwell's papers or confessions aid this case in the vital point. His statement, drawn up by opposite counsel and signed by him, that he had confessed judgment, is of no force, except to prove that a judgment had been entered by the court, and as evidence of that it is outweighed by the fact that no such entry is found on the large docket, where, according to course, it would be. If really no judgment was entered, then his admission that he confessed one comes to nothing. It don't enter it. And in regard to his waiver of inquisition and appraisement, it amounts to nothing beyond what it professes to be, a waiver of "notice of time and place of inquisition and appraisement." The law would give it no further effect. Equity will not go beyond law, to the injury of a mortgagor offering back all the money and years of accumulated interest. Was it Cromwell's duty in addition to all he had done, to see that the judgment which he had confessed, was entered to authorize the levari facias? Had the power ever been vested in him or any other person

in Pennsylvania, to validate process and pass titles to land, against the spirit and policy of the law? Does he now complain of the want of regularity of notice, or repudiate a single act of his?

Mr. Charles Bradford's entry nunc pro tunc, don't help the case, but makes it worse. It shows that there was no judgment on the record, in other words no judgment at all, while it shows how absolute was felt to be the necessity of one. His application was not to mould the judgment into technical form. Such a form it has never had. That being mere form, may always be considered as already done. What he sought was to give it substance. And how does he do it? He ingeniously takes a rule to show cause why the record should not be amended by the entry on the docket, of the judgment among the papers. The docket quoad hoc, is the record. And the motion is, therefore, to enter judgment on the record, from the judgment among the papers. Judgment among the papers! Who ever heard of a judgment among papers, as distinguished from judgment on the record? Independent of which there was no judgment; no act of the court or prothonotary—on the papers. That we have shown. Then Mr. Bradford appeared for neither party originally or now in interest. And if he had appeared for both, and we should concede the validity of the judgment as respects sales made after its entry, nunc pro tunc, how is it to infuse into it that retroactive vitality requisite to support a sale anterior to it?

GRIER, Circuit Justice. Assuming, for the present, the truth of the complainant's assertion, that the record in evidence does not show a legal judgment as foundation for a writ of levari facias, have the complainants shown themselves entitled to a decree on the other facts of the case?

On this assumption, their case stands thus: The mortgagee takes possession of the mortgaged premises, claiming to be the owner of the equity of redemption, and of an indefeasible estate in fee. The mortgagor, not disputing the validity of his claim, delivers the possession. The mortgagee and his vendees remain in possession, claiming the absolute fee for thirty years, rendering no account to the mortgagor, and denying his right to any, or that there is any subsisting trust, or privity with the mortgagor. Will equity, under such circumstances, decree an account, or interfere with the legal title of the mortgagee? Certainly not. It is a settled rule of equity, that, "if the mortgagor permits the mortgagee to hold possession for twenty years without accounting, or without admitting that he possessed the mortgage title only, the mortgagor loses his right of redemption, and the title of the mortgagee becomes as absolute in equity as it previously was at law." 2 Story, Eq. Jur. § 1028a, etc. Chancery will not interfere in favour of the mortgagor after twenty years, where the entry of the mortgagee was equivocal, or only under his defeasible legal title, and where no account has been rendered or demanded, or other acknowledgment of privity, trust, or subjection to the claim of the mortgagor; much less, when the mortgagee claimed and the mortgagor admitted the equity of redemption to be foreclosed, and when the purchasers, for a full consideration, from the mortgagee, have been in possession, making valuable improvements, claiming adversely to all the world for more than twenty years. For if, after such a great length of time, it should be discovered that there was some informality or irregularity in the proceedings intended to foreclose the mortgage, and for which the sale for that purpose might have been avoided; instead of being a reason why equity should interfere in favour of the mortgagor, it is the most conclusive reason to the contrary. It proves the very facts to exist, which equity presumed to exist from length of time alone; to wit, that the mortgagee did not hold in trust, or in privity with, or subjection to, the rights of the mortgagor.

But if length of time and the staleness of the complainant's claim, were not, of themselves, a conclusive objection to it, does not the case show acts and conduct of Thomas Cromwell, which should operate as an equitable estoppel to the claim now advanced?

Let us suppose a bill filed by the mortgagee to foreclose the mortgage, and that the mortgagor (knowing that the land is not worth the money secured on it, and his equity of redemption is worthless,) makes no objection to the foreclosure and sale, but instead of filing an answer to the bill, agrees with the mortgagee to expedite the sale and waive all matters of form; that he signs a written acknowledgment to be filed of record, admitting that the whole amount of mortgage money is due, and agreeing that a master may proceed to sell the premises immediately in discharge of the mortgage; that he waives a valuation; that he delivers up possession to the purchaser; that he stands by, without objection, and sees purchasers for large and valuable consideration, expend large sums in improvements, on the faith of the title thus acquired. Would a court of equity, under such circumstances, entertain a bill for an account, and treat the purchasers as trustees for the mortgagor, on the plea that he has since discovered a flaw or irregularity in the proceedings, and that there was no formal decree of the court foreclosing the mortgage? Surely it would not; and I need not attempt to fortify the assertion, by a reference to the very numerous cases to be found both in law and equity reports, on the subject of estoppel in pais. Yet the hypothetical case I have stated, is the one substantially before us. Cromwell gave his written assent to the sale, and assisted to expedite it, and thus encouraged purchasers to believe they obtained an indefeasible estate. He cannot now be per-

mitted, in a court of equity, to assert the defect of title.

II. Thus far we have considered this case on the assumption, that the allegation of the bill, which is the whole foundation of the complainant's claim, is true; to wit, that the record of the proceedings on the scire facias shows no judgment to support the writ of levari facias, and that the sheriff had no legal authority to sell. But the truth is, that this allegation of the bill is unfounded in fact. And the case shows: 1st. That even without the amendment of the docket, made in 1836, there is sufficient record evidence of a judgment. 2nd. That, if it were absolutely necessary to the validity of a judgment that it be recorded in a book or docket, there is sufficient evidence that such a docket record was made, and is now lost or destroyed. 3rd. That the amendment (though not strictly necessary,) was properly made, and being made, is absolutely conclusive between these parties.

It would lead to absurd and mischievous conclusions, if we should attempt to test the validity of the records of the courts of Pennsylvania, by a comparison with those of the king's bench and common pleas in England, or those, perhaps, of several of our own states.

In early times, one of the justices of the court had possession of the seal, signed all writs and judgments, took bail, and performed all the functions of the prothonotary. This continued to be the case till the adoption of the new constitution in 1790. After that time, and till the present constitution was adopted, the prothonotary was appointed by the governor; now he is elected by the people.

The judiciary act of the 13th of April, 1791 [1 Stat. 73], provides that these "prothonotaries shall have the like power to sign all judgments, writs of process, &c., as they had for those purposes, when they were justices of the court."

Since that time the prothonotary has exercised many quasi judicial functions. Parties appear before him and confess judgment ore tenus, in vacation or at any time; or it is entered upon a precipe, or written order from the party; or on a general power of attorney, or any other acknowledgment or agreement of the party to confess a judgment, whether written in the present or preterite tense. Cook v. Gilbert, 8 Serg. & R. 568; McCalmont v. Peters, 13 Serg. & R. 196; Reed v. Hamet, 4 Watts, 441.

But these prothonotaries, notwithstanding they exercised such large powers, were too often appointed or elected without any regard to their capacity to perform the duties of their office. Wholly ignorant of law and legal forms, they became a law unto themselves. There was no system, rule, form, or precedent adhered to. Judgments were seldom or ever signed by clerk or judge. No judgment roll or record proper is ever engrossed. Min-

utes of the acts and judgments of the court are made sometimes by the clerk in the minute book of the term, sometimes by the judge on the trial list, or in the rough docket, or indorsed on a case stated, or declaration, or other paper on file. Generally a large folio docket is kept, into which these minutes, whether found in the rough docket, book of minutes of court, trial list, or elsewhere, are collected and copied in a fair and legible hand. This duty is usually performed after every term, with more or less attention to accuracy and correctness, but often with many and important omissions. But all these entries, whether found in this docket or not, are but the minutes from which a formal record may be made, but in fact never is made. They are made as brief as possible, and are mere short hand intimations of what the record ought to be when drawn out in form. For the purpose of notice to purchasers, as regards liens, a minute of the judgment must be made in a certain docket called a judgment docket. But the want of this registry does not affect the judgment inter partes. None of these dockets has any title to be called the record of the court. Minutes of the acts of the court found in the trial or argument lists, in the handwriting of the judge, or indorsed on a case stated, or any other document or agreement of the parties or their counsel, filed in the suit, furnish as proper materials from which to draw out a proper technical record, as the short minutes copied into the folio docket. These minutes, whether made by the judge, the clerk, or an attorney, are always brief and informal; usually, the word "judgment," connected with the date and amount, or "judgment for sum due," leaving the clerk to compute it, is all the actual record that is made. When judge of the state court, I have entered many thousands in that way, and never signed one drawn up in legal form. The "ideo consideratum est" of a formal record of judgment, is nowhere to be found. When a defendant is willing and desirous to confess judgment, he may do it upon the back of the writ or narr., or by any other paper put on file; or he may come in propria persona before the prothonotary. There is no given form for such writing, or for the mode of recording the fact. Usually, when an agreement or acknowledgment, such as is found in this case, has been put on file, the entry made by the clerk on the rough docket would be, "Sept. 13, 1820, judgment confessed, see paper filed with writ;" a more careful clerk would transcribe the substance of the agreement; and a very careful one would have written out a copy on the rough docket, and have required the party to sign it. And I have known one prothonotary (a very worthy man, but somewhat eccentric in his orthography) who would have made the following minute only: "Cept. 13 gugt." Yet with this paper on file to show the amount and terms of the judgment, and with the help of which

a formal record might have been drawn up, no lawyer acquainted with the practice and records of Pennsylvania, would venture the assertion that there was no judgment.

In Prine v. Com., 6 Harris [18 Pa. St.] 103, the late Chief Justice Gibson complains that the same laxity and disregard of legal forms are to be found in criminal cases. "Our looseness," says he, "in recording forms of procedure, especially in criminal cases—if we have any forms left—has grown till the knowledge of the principles of which they were the exponents has been lost to the bench and the bar. More method sometimes appears in the record of a justice's judgment for a few dollars, than appears in the record of a conviction of murder."

A certified copy of the docket entries, is not legal evidence of a record. All the papers on file with their indorsements are as much entitled to that name. Leveringe v. Dayton [Case No. 8,288]. A clerk who understands his business and duties, could use these documents and memoranda, whether on the docket or on file, as a frame on which to construct a formal record, with all the verbiage to be found in Saunders's Reports, or the Appendix to 3d Blackstone's Commentaries. If the court in this case had refused to receive (as they might well have done) the docket, memoranda, and other papers read without objection as record, and required a formal record certified under the seal of the state court, the prothonotary would have been justified, nay, bound, to certify a judgment in the case as entered on the 13th of September, 1820, by confession or nil dicit, with the "ideo consideratum est," and any and all other terms of art to satisfy the formalist. The confession of judgment on file in this court, is itself the original, and as much a part of the record or minutes, from which a formal record may be made, as any other paper or docket memorandum in the case. The amendment of the docket made in 1836, was in fact superfluous and unnecessary as between the parties to the judgment. It was an amendment of the docket, not of the record. The omission of such registry being a palpable oversight or neglect of the clerk who copied the minutes of the record into that docket, it could be remedied at any time by the clerk, even without an especial order of the court to authorize it.

2dly. Assuming that a registry of the minute of judgment in a docket, is absolutely necessary to its legal existence, there is no law which requires it to be made in a large and not in small docket; in a folio bound in Russia leather, and not in a common bound rough docket; or that the original would not be as good record evidence, if it was in existence, as a copy. The omission of the clerk to copy the entry of judgment into the larger docket, would not invalidate it. The course pursued by the prothonotary, of making the minutes and entries first in the rough docket, which is now lost, leaves it altogether proba-

ble, if not certain, that the only omission of duty has been a neglect to afterwards copy it into the folio docket. But this presumption is legally conclusive, when connected with the other facts of the case. The written acknowledgment on file; the recital of the precipe, "scire facias sur mortgage and judgment. Issue levari," etc.; the writ of levari facias, reciting a judgment; the indorsement by the defendant Cromwell on the writ; the sale made with the concurrence of the defendant, remaining unquestioned by him during his whole life, and for the space of thirty years. These facts can leave no doubt that the lost docket contained a record of the judgment on which the writ of levari facias and sale by the sheriff were founded. If, after such a length of time, titles could be called in question for want of some writ, docket, or other memorandum, no man's property in Pennsylvania would be safe; and more especially would this be the case in Pittsburg, where process of execution on which valuable titles depend, is often found among the papers of deceased attorneys and sheriffs, who have sometimes removed to near or to distant places and states, and where the archives of the court are treated as useless lumber. The case of Shaw v. Boyd, 12 Pa. St. 215, would have been without difficulty, if any paper on file had shown that a judgment had been entered, as in the present case. There, on the issue of "nul tiel record," the court presumed that a judgment had been entered in 1820, from lapse of time and other circumstances. "The probability is," says the court, "that judgment was entered on the back of the paper containing the case stated, or special verdict. That paper is now lost or mislaid, and cannot be found. Strong presumptions are tolerated and allowed in favour of records irregularly kept, after a great length of time."

3dly. Assuming it in the last place to be absolutely necessary that the entry of judgment should be copied into the folio docket, in order to give it validity; the omission to do so is a clerical error or misprision, which may be amended at any time; and the amendment when made is conclusive, and cannot be denied or questioned in a collateral suit.

A court may possibly not have the power to alter or vacate its own judgments truly recorded, after the term to which they have been entered. But that any misprision, omission, or mistake of the clerk may be amended at any time, where the record shows anything to amend by, has never been doubted since the statute of 1 Edw. III. c. 6. It is a power vested in every court, and one which it is their duty to exercise in a proper case, in order that suitors may not suffer by the carelessness or mistakes of clerks and officers. It is a power committed to the discretion of the court, to be exercised over their own records, and the correct use of that discretion cannot be questioned by another court, even on a writ of error. The jurisdic-

tion of the court does not depend on the consent or presence of the parties to the suit, but on the power of the court over its own records. A record is received as absolute verity, and it is the duty of the court to see that it speaks the truth and the whole truth. If the amendment made is according to the truth, the parties have no right to complain. If it be alleged that the amendment was ordered on a false suggestion, the party making such allegation should apply to the court to vacate or set aside such order for that reason. The court of common pleas of Alleghany county having decided that a judgment was confessed by Cromwell on the 13th of September, 1820, and that it should have been entered by the clerk on the docket, and having ordered that omission to be amended nunc pro tunc, it is conclusive evidence to this court that such a judgment was rendered or confessed on the 13th of September, 1820. The complainants in this case cannot question its propriety or deny its effects.

The case of the complainants, taken as a whole, is therefore without foundation, either in fact or in law.

The doctrines which I have just stated are supported to their fullest extent by precedent. I need refer but to few to be found in the reports of Pennsylvania.

In Maus v. Maus, 5 Watts, 319, the court say, "It is never too late to amend the record merely for the purpose of correcting a misprision of the clerk." In Owen v. Simpson, 3 Watts, 87, it is decided, "That not only has every court the power, but it is its duty to amend a clerical error which stands in the way of justice, and when it is evident the defect was produced by the blunder of the prothonotary. To suffer the imprision of a clerk to destroy the title of a purchaser, with such materials for amendment, would be inconsistent with the liberality which is so conspicuous a feature of the day."

In Murray v. Cooper, 6 Serg. & R. 126, a judgment given in 1808, was neglected to be recorded; and in 1816, the court amended the record by ordering a judgment to be entered as of August term, 1808. On error brought to reverse this amendment, the supreme court decided that it was not the subject of review on a writ of error, and say, "The court has power, in order to do justice, to enter judgment at their discretion as of a past term when it ought to have been entered. They exercised that discretion; they had a right to do so, and we cannot say they have abused it." In Wilkins v. Anderson, 11 Pa. St. 399, a memorandum found on an old trial list, in the handwriting of the judge, was considered sufficient record evidence that a person was substituted as defendant, where the docket entry of the verdict and judgment and the other papers in the cause, showed another person as the defendant. And the court say, "This entry on the trial list being among the archives or monuments from which a record may be made at any distance of time, the record might be amended." In De Haas v. Bunn, 2 Barr [2 Pa. St.] 339, the court say, "It is only by patching up errors in matters of mere form arising from inexperience consequent on the popular principle of rotation in office, that we can hope to preserve the substance of justice." In Rhoads v. Com., 3 Harris [15 Pa. St.] 272, the court state it as "a plain legal truth, which ought not to have been brought in question, that the court having the power to amend, the regularity of the amendment cannot be inquired into collaterally." So also in Sickler v. Overton, 3 Barr [3 Pa. St.] 325, and see 7 Serg. & R. 180.

These are but a few of the cases on this subject; and an examination of them will show amendments of clerical omissions and misprisions, "reconstructions of the whole fabric of writs," presumptions of records, far beyond any charity which need be invoked to hide the omission in this case, so easily corrected, and afterwards actually and conclusively amended. Much of the most valuable property in Pennsylvania has gone through the hands of the sheriff, and nearly all through the orphans' court more than once. In most of these cases the titles now depend on the preservation of loose papers and other documents by officers selected too often with little regard to any principle save that of rotation; whereby skill and experience are often superseded by ignorance and incompetency.

Bill dismissed with costs.

NOTE [from original report]. The evidence given in the case presents somewhat vividly the manner in which records are occasionally kept in Pennsylvania. A witness who had been employed to hunt up all the evidences of judgment entered in the original suit against Cromwell, testified as follows:

"At the request of the solicitor for the respondents in this case, I proceeded to the top of the court house, and in a space surrounding the base of the cupola, amidst a quantity of old acts of assembly thrown negligently down into the space, I found a number of old papers, apparently belonging to the prothonotary's office, and a number of old, rough, appearance dockets. I returned twice afterwards, took a candle, went down into this space, and made a most thorough search. I handled every paper and docket that was there. Some of these dockets went as far back as 1789, or farther: and some came down as late as 1836. They were in a damaged condition, dirty, and apparently thrown away as useless. The docket of 1820 I could not find. The nearest I came to it was the one of 1821. I also made an examination in the prothonotary's office, and was unable to find it there. There were entries of judgments, and confessions of judgments, on these dockets."

This carelessness of records is not peculiar to western Pennsylvania. For many years past, it has been known to autograph hunters in Philadelphia, that a vast number of ancient, curious and valuable papers were piled carelessly about the loft over the supreme court room of the state, at the south-east corner of Sixth and Chestnut streets. They were in truth the records of the criminal courts and court of common pleas of Philadelphia, and of the supreme court of the state, from the very earliest date until comparatively recent times. Through the zealous diminutions of them by members

of the Historical Society of Pennsylvania and other curious persons. they have now in a large degree passed into public or private collections. The history of their removal to the loft, was not the least interesting part of their history. It appeared that they had been taken from their proper repositories some years since to make room for coming and anticipated records of a later date, and put into one of the cellars of the public buildings. The cellar being wanted as a place to confine vagrant dogs, the records were carted round to the hall above mentioned, and taken in barrows and baskets up two pair of stairs, where they were pitched down negligently about the loft of the building. Being dry, they were found quite useful for some time in kindling various fires in the court rooms about the building; but the building itself having taken fire one day, the value of them for this purpose, was impaired by the city hose having been allowed to empty the issues of several fire-plugs for some hours upon them.

More recent times have probably not improved the matter. An acquaintance suggests to me a case well remembered at the bar of Philadelphia, which had been several times taken to the supreme court in banc, on various points, all charged or chargeable to the loss of an original record. The case got so bad at last, and, from the loss of the papers, was such a stated source of intemperate vexation and dispute, that it was becoming the plague of every body who had any thing to do with the court. One day, in 1850, when matters had got to a pass which defied all possibility of any settlement, and the thing was expected to make fine matter for a summer's morning, the record was found—inside of the stove. Mr. Ingraham, as amicus curiae, informing the court, that the inside of the stove was a place where it was well known that many records were put in winter; but that, until the recent discovery, it was generally supposed that a different disposition was made of them in summer.

Lest our English brethren should suppose that this carelessness of judicial records is confined to America, let me mention for their benefit, that the same negligence prevails among themselves. In a summer ramble in 1850, through the interior of England, I accompanied a relative, eminent for his taste and pursuits in architecture, through the upper parts of the Sheldon Theatre, at Oxford. On our way through its lofts to examine the joints and beams of its curious cupola, my eye was caught by baskets of records placed about the floor; which, I ascertained from our guide, were records of some kind from the English courts. The city library at Philadelphia, contains two huge volumes of original papers, communications from the privy council and warrants from the king himself to the lord lieutenant of Ireland—many of these last apparently connected, not remotely, with the titles of landed estates in Ireland; and I am, myself, the owner of an original record of the English chancery, sold, with a great number of similar things, at auction in Philadelphia, for a few cents; and valued only as containing a noble illustration alike of Lord Hardwicke's well known autograph and of his intelligence and decision in chancery decrees.